# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 26, 2023              Decided June 16, 2023

No. 22-1242

PEABODY MIDWEST MINING, LLC AND MICHAEL BUTLER,
EMPLOYED BY PEABODY MIDWEST MINING, LLC,
PETITIONERS

v.

SECRETARY OF LABOR, MINE SAFETY AND HEALTH
ADMINISTRATION (MSHA) AND FEDERAL MINE SAFETY AND
HEALTH REVIEW COMMISSION,
RESPONDENTS

———

On Petition for Review of a Decision of the
Federal Mine Safety and Health Review Commission

———

*R. Henry Moore* argued the cause and filed the briefs for petitioners. *Patrick W. Dennison* entered an appearance.

*Susannah M. Maltz*, Attorney, U.S. Department of Labor, argued the cause for respondents. With her on the brief was *Emily Toler Scott*, Counsel for Appellate Litigation.

Before: PILLARD, KATSAS and RAO, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* PILLARD.

2

PILLARD, *Circuit Judge*:     In the early morning hours on July 23, 2018, drillers at the Francisco underground coal mine hit a pocket of gases, causing methane to blast into their worksite in highly volatile concentrations.     Methane is considered the most dangerous gas in underground mining; in sufficient concentrations, methane can ignite and cause a potentially catastrophic explosion.  To protect worker safety, Mine Safety and Health Administration (MSHA) regulations thus require miners to deenergize equipment and cease work when they detect certain methane concentrations.  But during the methane inundation at the Francisco mine the miners did not stop work.  They instead continued operating an energized drill, trying to stop the flow of methane.

MSHA issued two orders citing the mine operator, Peabody Midwest Mining, LLC, for violating the applicable safety regulations and designated those violations as unwarrantable failures.  It also individually cited the mine's manager, Michael Butler, as Peabody's agent.    An administrative law judge and then the Federal Mine Safety and Health Review Commission agreed with MSHA that Peabody violated MSHA safety regulations, that those violations constituted unwarrantable failures, that mine manager Butler was individually liable, and that civil penalties were appropriate.  Peabody and Butler petitioned for review in this court.  We deny the petition.  MSHA safety regulations unambiguously prohibited Peabody's operation of an energized drill in a high-methane environment, and substantial evidence supports the Commission's unwarrantable failure and individual liability determinations.

3

## BACKGROUND

### A.

Congress enacted the Federal Mine Safety and Health Act (Mine Act) to "protect the health and safety of the Nation's coal or other miners." 30 U.S.C. § 801(g). Under the Act, "[t]he Labor Secretary, acting through MSHA, sets regulatory standards for mine safety, conducts regular mine inspections and issues citations and orders in response to violations." *Sec'y of Labor v. Knight Hawk Coal, LLC*, 991 F.3d 1297, 1300 (D.C. Cir. 2021); *see generally* 30 U.S.C. §§ 811, 813-15, 820. The Federal Mine Safety and Health Review Commission (FMSHRC or Commission) is an independent adjudicatory body that reviews citation, penalty, and order decisions by MSHA. *Knight Hawk Coal*, 991 F.3d at 1300; *see* 30 U.S.C. §§ 815(d), 823.

Methane is considered mining's deadliest gas. A byproduct of coal, methane is often present in underground coal mines. When methane concentrations in the air reach 5% by volume, the gas becomes explosive. An ignition source, such as a spark from electrical equipment, can light the methane and trigger a potentially deadly explosion.

MSHA safety standards prescribe actions that mine operators must take to address methane as it accumulates in different parts of a mine. *See* 30 C.F.R. § 75.323. The standards are tiered, requiring additional steps as methane concentrations increase. As relevant here, subsection 75.323(c) lays out what operators must do when methane accumulates in a return air split (an airway ventilating air away from a working face or worksite and out of the mine). That subsection provides:

4

(1) When 1.0 percent or more methane is present in a return air split . . . changes or adjustments shall be made at once to the ventilation system to reduce the concentration of methane in the return air to less than 1.0 percent.

(2) When 1.5 percent or more methane is present in a return air split . . .

    (i) Everyone except those persons referred to in § 104(c) of the Act shall be withdrawn from the affected area;

    (ii) Other than intrinsically safe AMS, equipment in the affected area shall be deenergized, electric power shall be disconnected at the power source, and other mechanized equipment shall be shut off; and

    (iii) No other work shall be permitted in the affected area until the methane concentration in the return air is less than 1.0 percent.

*Id.* § 75.323(c). AMS is not defined in the rule or record but apparently refers to atmospheric monitoring systems.

Two provisions are principally at issue in this case. The first is subparagraph (c)(2)(ii), which we here refer to as the deenergization-and-disconnection provision. That provision requires operators to deenergize equipment, disconnect electric power, and shut off mechanized equipment when methane levels reach 1.5%. *Id.* § 75.323(c)(2)(ii). The second is subparagraph (c)(2)(iii), or the no-other-work provision, which

5

prohibits any "other work" until methane levels return to below 1%. *Id.* § 75.323(c)(2)(iii).

**B.**

This case arises out of a methane inundation at the Francisco underground coal mine in Indiana. Peabody Midwest Mining, LLC (Peabody) operates the Francisco mine. In July 2018, Peabody contracted with REI Drilling to conduct exploratory drilling for abandoned mine works. Mine operators often conduct exploratory drilling ahead of coal extraction to avoid inadvertently encountering abandoned mine works during the mining itself.

During the early morning hours on July 23, 2018, an REI Drilling employee, Robert Ferrin, and a Peabody miner, John Stevens, were conducting exploratory drilling at the mine. Including miners working elsewhere in the mine, there were approximately 60 people underground at the time. At around 1:49 a.m., the exploratory drill hit a void, meaning it punched through solid matter and opened a pocket of gases. Air and methane began to blast through the borehole. Moments later, a personal methane detector (or "spotter") worn by Stevens began to alarm and read "over range," indicating methane levels in excess of 5% by volume. At some point, Ferrin's methane spotter also began to alarm and read over range.

Stevens phoned to ask the mine manager, Michael Butler, to come to the drill site. Butler arrived at the drill site within a few minutes. When Butler arrived, Ferrin and Stevens were using an energized drill to pull drill rods out of the borehole to clear the hole so they could try to plug it and stop the methane inundation. Butler leaned in to speak to Ferrin and, as he did so, his spotter also alarmed to signal that it detected methane levels in excess of 5%. Ferrin told Butler that they needed to remove the rods and plug the hole. Butler agreed to that plan.

6

Butler then directed a maintenance foreman to deenergize other equipment, kill power on the unit, and evacuate other miners, which the foreman did. But Butler explicitly instructed the foreman to maintain power to the drill.

Stevens and Ferrin continued using the drill to pull drill rods. The drill had a safety feature to prevent methane explosions: Its methane sensor automatically shut down the drill when methane levels exceeded 2%. While Ferrin and Stevens were working, the drill shut itself down two or three times. Each time the drill shut down, the men waited a few minutes for the methane levels to drop low enough so that they could repower the drill.

Before long, the mine's tracking office contacted Peabody's General Manager of the Francisco mine, Brad Rigsby, at his home. Rigsby ordered that all mining operations at the unit cease and that the miners "get ready to pull out." Hr'g Tr. 401 (J.A. 257). While driving to the mine, Rigsby called the MSHA District Manager to report the methane inundation. When he arrived at the mine, Rigsby called Butler, who informed Rigsby that the drillers were preparing to plug the borehole. Rigsby, who had not known that the drill was energized and that miners remained at the worksite, told Butler to cut power to all equipment and bring everyone out of the unit. As for the methane pouring out of the borehole, Rigsby told Butler to "let it bleed." *Peabody Midwest Mining, LLC*, 44 FMSHRC 515, 518 (2022) (quoting Hr'g Tr. 404-05, 415). Rigsby's evacuation order came at least a half hour or so after Butler first arrived at the drill site. The miners evacuated shortly thereafter.

As relevant here, MSHA issued two orders to Peabody for violating mine safety regulations during the methane inundation. The first was for failing to deenergize the unit and

7

disconnect power once methane concentrations exceeded 1.5%. *See* Order No. 9106663 (J.A. 39-40, 70-71); 30 C.F.R. § 75.323(c)(2)(ii). The second was for permitting other work—*i.e.*, authorizing miners to pull rods and plug the borehole—when methane had not decreased to or below 1.0%. *See* Order No. 9106664 (J.A. 41, 72); 30 C.F.R. § 75.323(c)(2)(iii). Both orders were designated as "unwarrantable failures," a designation MSHA applies to aggravated conduct beyond ordinary negligence. MSHA also determined that Butler was individually liable because he knowingly authorized and carried out the violations. MSHA proposed civil penalties against both Peabody and Butler.

The Secretary of Labor then petitioned an administrative law judge (ALJ) for penalty assessments. The ALJ held an evidentiary hearing and issued a consolidated decision and order finding both violations to be unwarrantable failures and imposing penalties on Peabody and on Butler individually as Peabody's agent. Peabody and Butler contested the orders before the Federal Mine Safety and Health Review Commission, which affirmed. Peabody and Butler then timely petitioned for review in this court.

## DISCUSSION

We review the Commission's legal conclusions *de novo* and findings of fact for substantial evidence. *Knight Hawk Coal*, 991 F.3d at 1306. When interpreting a MSHA safety standard, if "there is only one reasonable construction of [the] regulation," then "the court must give it effect, as the court would any law." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019).

Peabody and Butler advance three principal arguments in their petition. First, they contend that Peabody did not violate MSHA safety standards by allowing a drill team to continue working in a high-methane environment to remove rods and

8

attempt to plug the borehole. Second, they challenge the unwarrantable failure determinations. Third, they contest Butler's individual liability for any violation, arguing that he acted reasonably and in good faith to abate the methane hazard. We hold that Peabody violated the applicable MSHA safety standards. We further sustain the Commission's determinations that substantial evidence showed Peabody's violations to be unwarrantable failures and supported Butler's individual liability.

**A.**

Peabody first argues that it did not violate the MSHA safety regulation prohibiting "other work" when methane levels exceed 1.5% because the work it conducted—pulling drill rods and attempting to plug the borehole—was intended to stop the methane inundation. We hold that the no-other-work provision unambiguously prohibited Peabody's work using an energized drill in those circumstances.

Recall that MSHA safety regulations impose three requirements when methane levels exceed 1.5% in a return air split: Mine operators must (i) withdraw everyone from the affected area (except for certain exempt individuals), (ii) deenergize equipment (other than specific intrinsically safe equipment) and disconnect the power source, and (iii) permit "[n]o other work" until methane levels fall below 1.0%. 30 C.F.R. § 75.323(c)(2). Recall also that Peabody challenges two MSHA orders. The first was for failing to deenergize the drill when methane exceeded 1.5%, in violation of the deenergization-and-disconnection provision, subparagraph (c)(2)(ii). The second was for permitting "other work"—that is, pulling rods and attempting to plug the borehole—when methane levels had not fallen below 1.0%, in violation of the no-other-work provision, subparagraph (c)(2)(iii).

9

Peabody challenges the finding of a violation only as to the second order involving the no-other-work provision, having conceded before the Commission that it violated the deenergization-and-disconnection provision. The facts underpinning that second order are largely undisputed: In an area with methane levels fluctuating above 1.5%, Peabody attempted to abate the methane by pulling drill rods with an energized drill. The question before us is thus a legal one: whether the no-other-work provision barred Peabody's work with an energized drill.

The Secretary urges that the bar against "other work" prohibits all but work necessary to withdraw miners, deenergize equipment, and disconnect power at the source. Peabody counters that the provision should be read to allow ventilation control and other work aimed at reducing methane, like plugging the borehole. To bolster its argument, it points in part to another provision of MSHA safety regulations requiring "changes or adjustments [to] be made at once to the ventilation system" in a return "when 1.0 percent *or more* methane is present." 30 C.F.R. § 75.323(c)(1) (emphasis added). According to Peabody's logic, the standard in paragraph (c)(1) permits ventilation adjustments, as it broadly construes the term, whenever methane is above 1%, even when it exceeds 1.5%.

We, like the Commission, conclude that "it is unnecessary to fully define the categories of work" prohibited by the no-other-work provision. *Peabody Midwest Mining*, 44 FMSHRC at 522. Even assuming some ventilation adjustments might be permitted when methane exceeds 1.5%, the MSHA regulations plainly prohibit Peabody's use of an energized drill to try to plug the borehole and thereby lower methane levels. After all, paragraph (c)(2), requiring the operator to conduct "[n]o other work," also requires the operator to withdraw miners and to

10

deenergize and disconnect power.  30 C.F.R. § 75.323(c)(2)(i)-
(iii).    Given  the  separate  requirement  for  operators  to
"deenergize[]"  equipment  and  "disconnect[]"  electric  power
when  methane  levels  exceed  1.5%,  the  no-other-work
provision  must  at  minimum  bar  work  with  an  electrically
powered drill.  *Id.* § 75.323(c)(2)(ii).  In other words, our
interpretation of the no-other-work provision "*cannot* conflict
with the plainly stated requirement in subparagraph (c)(2)(ii)
that  all  equipment  be  de-energized."    *Peabody  Midwest
Mining*, 44 FMSHRC at 522.

Interpreting  the  no-other-work  provision  to  at  least
prohibit  energized  work  is  consistent  with  the  standards'
purposes.  MSHA safety regulations aim to protect miners from
methane, "the most dangerous gas encountered by miners
working underground."  Safety Standards for Underground
Coal Mine Ventilation, 61 Fed. Reg. 9764, 9777 (1996).  They
"establish[] action levels" below the 5% explosive limit "to
permit appropriate actions to be taken by mine operators in
order to prevent an explosion."  *Id.*  "Deenergizing or shutting
off" electrical equipment "protects miners by preventing th[at]
equipment  from  providing  ignition  sources."    *Id.*  at  9778.
Permitting energized work when methane levels exceed 1.5%
would ill serve those purposes.  Indeed, energized work in a
high-methane environment creates the very risk of explosion
that the MSHA safety regulations seek to avert.

Peabody protests that our interpretation of the no-other-
work provision renders the two orders "duplicative," such that
it has been punished twice for the same act: not deenergizing
the drill.  But MSHA orders and citations are not duplicative
"as  long  as  the  standards  allegedly  violated  impose  separate
and distinct duties."  *Ky. Fuel Corp.*, 38 FMSHRC 1614, 1616
(2016).  Here, the deenergization-and-disconnection provision
and  the  no-other-work  provision  imposed  separate  duties:

11

Peabody had a duty to deenergize the drill, and it had a duty not to use the drill to conduct any work. Even if Peabody had for some reason left the drill energized, it could have still avoided the second MSHA order by choosing not to continue working with the drill within the mine. Similarly, Peabody could have avoided the first violation by doing some form of disallowed work that did not involve energized equipment. Peabody's violation of the no-other-work provision thus encompasses "conduct . . . that was not already considered" in its violation of the deenergization-and-disconnection provision. *Id.* at 1617.

Finally, Peabody attempts to invoke a "diminution-of-safety" or "greater-hazard" defense, arguing that noncompliance with the regulations was safer than compliance. A diminution-of-safety defense is generally available only when a mine operator first petitions MSHA for a modification of the standard, *see* 30 U.S.C. § 811(c), which Peabody agrees it neither did nor had the time to do on the morning of July 23. To raise such a defense *without* a petition for modification, Peabody would have had to show that (1) the hazards of compliance are greater than those of noncompliance, (2) alternative means of protecting miners were unavailable, and (3) a modification proceeding would have been inappropriate. *Westmoreland Coal Co.*, 7 FMSHRC 1338, 1341 (1985).

Peabody forfeited any such defense. Under the Mine Act, "[n]o objection that has not been urged before the Commission shall be considered by th[is] court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 30 U.S.C. § 816(a)(1). Peabody only glancingly alluded to the logic behind a diminution-of-safety or greater-hazard defense in its post-hearing brief before the ALJ and in a footnote in its brief before the Commission.

12

"[A]t no point" did Peabody explain how it met the three
requirements for asserting such a defense without a petition for
modification. *Marshall Cnty. Coal Co. v. FMSHRC*, 923 F.3d
192, 205 (D.C. Cir. 2019). Because Peabody's attempted
defense is too little too late, we do not consider it.

**B.**

Next, Peabody argues that neither order should have been
designated an "unwarrantable failure." Under the Mine Act,
the Secretary may find certain violations "to be caused by an
unwarrantable failure" to comply with MSHA health or safety
standards. 30 U.S.C. § 814(d)(1). An "unwarrantable failure"
involves "aggravated conduct, constituting more than ordinary
negligence, by a mine operator in relation to a violation of the
Act." *Black Beauty Coal Co. v. FMSHRC*, 703 F.3d 553, 560
(D.C. Cir. 2012) (quoting *Jim Walter Res., Inc. v. Sec'y of
Labor*, 103 F.3d 1020, 1025 (D.C. Cir. 1997)).

The Commission uses a multifactor test to determine
whether a violation stems from an unwarrantable failure. It
considers whether the violation posed a high degree of danger;
the extent of the violative condition; whether the violation was
obvious; the operator's knowledge of the violation; the length
of time that the violation existed; the operator's efforts in
abating the violative condition; and whether the operator was
on notice that greater efforts were necessary for compliance.
*Id.* at 560. "While an administrative law judge may determine,
in his discretion, that some factors are not relevant, or may
determine that some factors are much less important than other
factors under the circumstances, all of the factors must be taken
into consideration and at least noted by the judge." *Id.* (quoting
*IO Coal Co.*, 31 FMSHRC 1346, 1351 (2009)). The ALJ here
acknowledged Peabody's good faith efforts to stanch the flow
of methane. But the ALJ found that those actions were not

13

reasonable where the violative conditions were highly dangerous, extensive, obvious, known, and of sufficient duration to constitute an unwarrantable failure.

We sustain the unwarrantable failure determinations. The ALJ considered each factor, reasonably deeming one factor—prior, similar violations providing notice of a need for greater compliance efforts—to be irrelevant in the absence of any evidence of past violations. Substantial evidence supports the factual findings underpinning the unwarrantable failure designations. Peabody's conduct posed a high degree of danger because "methane levels nearby [the energized drill] exceeded five percent, creating the conditions that could have led to combustion and a major accident." *Peabody Midwest Mining*, 44 FMSHRC at 523-24 (quoting 44 FMSHRC 377, 387 (2021)). The violation was extensive, exposing no less than six miners to the risk of an explosion. The violation was also obvious, as high methane levels set off at least three methane spotters and caused the drill to shut off at least twice. Furthermore, Peabody knew of the violative condition: Butler, as Peabody's agent, knew of multiple methane detectors signaling high levels of methane, yet he approved continued use of the drill, even directing that power to the drill be maintained as other power was shut off. As for the duration of the violative condition, the Commission rightly recognized that "substantial evidence only supports a finding that energized work was ongoing for approximately half an hour." *Peabody Midwest Mining*, 44 FMSHRC at 525. The 30-minute violation may have been brief, but "the brief duration of a violative condition . . . does not militate against a finding of unwarrantable failure if the hazardous condition is 'readily distinguishable from other types of violations' due to the 'high degree of danger' it poses and its 'obvious nature.'" *Knight Hawk Coal, LLC*, 38 FMSHRC 2361, 2371 (2016) (quoting *Midwest Material Co.*, 19 FMSHRC 30, 36 (1997)). The

14

obvious and highly risky methane exposures here meet that standard.

The ALJ credited Peabody's attempt to abate the influx of methane as a mitigating factor in his unwarrantable failure analysis. But, as the Commission correctly noted, the relevant "[a]batement would consist of stopping work and de-energizing." *Peabody Midwest Mining*, 44 FMSHRC at 525 n.19. So the ALJ should have been asking whether Peabody sought to "abat[e] the violative condition," *Black Beauty Coal Co.*, 703 F.3d at 560 (quoting *IO Coal Co.*, 31 FMSHRC at 1351)—that is, to abate the failure to stop work and to deenergize equipment. Peabody instead continued work with energized equipment. While Peabody sought to abate one perceived hazard (the methane inundation), those efforts created the violative condition (work with an energized drill in the presence of six miners while methane concentrations exceeded 1.5%) and the attendant risk of explosion.

Lastly, Peabody challenges the unwarrantable failure determinations on the ground that it reasonably believed that it was complying with the relevant safety standards. An operator's reasonable, good-faith belief that its cited conduct was the safest method of compliance with the regulations can be a defense to an unwarrantable failure determination. *Cyprus Plateau Mining Corp.*, 16 FMSHRC 1610, 1614-16 (1994). But, while Peabody may have sincerely believed it was acting safely, "no prudent operator would have believed that it was reasonable" regulatory compliance to disregard the clear prescriptions of the MSHA regulations and keep the drill energized in a high-methane environment. *Peabody Midwest Mining*, 44 FMSHRC at 526 n.20 (quoting 44 FMSHRC at 388). That is especially true given the well-known dangers in combining elevated methane levels with a possible ignition source.

15

## C.

We now turn to the decision to hold Butler, as a corporate agent for Peabody, individually liable for the violations. Under the Mine Act, corporate agents are liable for a safety violation if they "knowingly authorized, ordered, or carried out [the] violation." 30 U.S.C. § 820(c). To be individually liable, an agent must demonstrate "aggravated conduct," not just "ordinary negligence." *Freeman United Coal Mining Co. v. FMSHRC*, 108 F.3d 358, 363 (D.C. Cir. 1997) (quoting *BethEnergy Mines, Inc.*, 14 FMSHRC 1232, 1245 (1992)). Under longstanding Commission precedent, an agent of an operator may be liable where he is "in a position to protect employee safety and health [and] fails to act on the basis of information that gives him knowledge or reason to know of the existence of a violative condition." *Kenny Richardson*, 3 FMSHRC 8, 16 (1981).

Substantial evidence supports the Commission's decision to subject Butler to individual liability. Butler knew of the violative condition: He knew that several spotters, including his own, were reading "over range," indicating methane levels in excess of 5%, yet he personally asked that the drill remain energized. Butler was also in a position to remedy the violation and protect employee safety. He acknowledged that he was the "number one man" on site and could order the miners to cut power and stop pulling rods "if [he] felt that was needed." Hr'g Tr. 365-66 (J.A. 250-51). Instead of immediately and directly abating the methane risk in the manner the regulation directs, Butler authorized continued operation of the energized drill.

In contesting his liability, Butler argues that he acted in good faith to address the hazard presented by the unplugged borehole. Under Commission precedent, a good-faith belief in the safety of the cited conduct can be a defense to individual

16

liability under 30 U.S.C. § 820(c) only if it is also reasonable in the circumstances. *See Lafarge Constr. Materials*, 20 FMSHRC 1140, 1150 (1998). The Commission did not err in rejecting Butler's attempted defense. While Butler acted in good faith to address the perceived methane hazard, taking what he believed to be the best course in an emergency situation, his belief in the safety of plugging the borehole was unreasonable. Multiple methane sensors alarmed and the drill shut itself down because methane had reached levels MSHA's regulations treat as posing extreme risk. Yet, Butler authorized the miners to keep working despite the danger. As the Commission recognized, "[b]y permitting miners to work with energized equipment, Butler risked incurring the very hazard section 75.323(c)(2) is intended to address, i.e., potential ignition [in a] high-methane environment." *Peabody Midwest Mining*, 44 FMSHRC at 528.

\*     \*     \*

For the foregoing reasons, we deny Peabody and Butler's petition for review.

*So ordered.*