## THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| PEABODY MIDWEST MINING, LLC ) <br> AND MICHAEL BUTLER, ) <br> EMPLOYED BY PEABODY ) <br> MIDWEST MINING, LLC ) <br> ) <br>      Petitioners, ) <br> ) <br>   v. ) <br> ) <br> SECRETARY OF LABOR, MINE ) <br> SAFETY AND HEALTH ) <br> ADMINISTRATION (MSHA) AND ) <br> FEDERAL MINE SAFETY AND ) <br> HEALTH REVIEW COMMISSION, ) <br> ) <br>     Respondents. ) | Docket No.   22-1242 |

## CERTIFICATE AS TO PARTIES, RULINGS, RELATED CASES AND UNDERLYING DECISION FROM WHICH REVIEW ARISES

**1.    Parties and amici**

All parties, intervenors, and amici appearing before the Federal Mine Safety

and Health Review Commission and in this Court are:

- Secretary of Labor, Mine Safety and Health Administration

- Peabody Midwest Mining, LLC

- Michael Butler

- Federal Mine Safety and Health Review Commission

FP 45358716.1

## 2.     Rulings under review

The ruling under review is the Federal Mine Safety and Health Review Commission's decision in <u>Peabody Midwest Mining, LLC and Michael Butler, employed by Peabody Midwest Mining, LLC</u>, Commission Docket Nos. LAKE 2019-023, LAKE 2019-122 and LAKE 2019-361.  The decision is not yet reported, but is available at <u>Peabody Midwest Mining, LLC and Michael Butler, employed by Peabody Midwest Mining</u>, 2022 WL 4016593 (FMSHRC August 24, 2022).  A copy is attached hereto to comply with Order of September 21, 2022 to provide a copy of the decision for which the Petition for Review arises.  It was attached also to the Petition for Review.

## 3.     Related cases

This case was not previously before this Court or any other court. Counsel is unaware of any related cases pending before this Court or any other court.

Respectfully submitted,

*s/ Ralph Henry Moore, II*
Ralph Henry Moore, II
Patrick W. Dennison
Fisher Phillips, LLP
6 PPG Place, Suite 830
Pittsburgh, PA 15222
hmoore@fisherphillips.com
pdennison@fisherphillips.com

Counsel for
Peabody Midwest Mining, LLC and
Michael Butler, employed by Peabody
Midwest Mining, LLC

**FEDERAL MINE SAFETY AND HEALTH REVIEW COMMISSION**

1331 PENNSYLVANIA AVENUE, NW, SUITE 520N

WASHINGTON, DC 20004-1710

August 24, 2022

| | | |
|---|---|---|
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | Docket Nos. LAKE 2019-0023 |
| v. | : | LAKE 2019-0122 |
| | : | |
| PEABODY MIDWEST MINING, LLC | : | |
| | : | |
| | : | |
| SECRETARY OF LABOR, | : | |
| MINE SAFETY AND HEALTH | : | |
| ADMINISTRATION (MSHA) | : | |
| | : | Docket No. LAKE 2019-0361 |
| v. | : | |
| | : | |
| MICHAEL BUTLER, employed by | : | |
| PEABODY MIDWEST MINING, LLC | : | |

BEFORE:  Traynor, Chair; Althen and Rajkovich, Commissioners

**<u>DECISION</u>**

BY THE COMMISSION:

This proceeding arises under the Federal Mine Safety and Health Act of 1977, 30 U.S.C. § 801 et seq. (2018) ("Act" or "Mine Act").  It involves two orders issued to Peabody Midwest Mining, LLC ("Peabody") and two personal liability assessments issued to Peabody employee Michael Butler.[1]  All four issuances arise from a methane event at Peabody's Francisco Mine.

Order Nos. 9106663 and 9106664 allege that a drill team continued to operate energized equipment after 5% methane was detected, in violation of requirements to de-energize equipment and stop prohibited work if at least 1.5% methane is present.  30 C.F.R. §§ 75.323(c)(2)(ii), (iii). Both were issued as significant and substantial ("S&S") and the result of an unwarrantable

---

[1]  A third order involving a violation of the examination requirements at 30 C.F.R. § 75.512-2 has not been appealed.

failure.[2]  Based on the same conduct, the Secretary of Labor also issued two personal liability assessments against Mr. Butler, the mine manager and shift supervisor during the event, pursuant to section 110(c) of the Act.[3]  The Administrative Law Judge affirmed both orders including the S&S and unwarrantability findings, and both personal liability assessments.  44 FMSHRC 377 (May 2022) (ALJ) (previously unpublished decision initially issued on May 28, 2021).

On appeal, Peabody challenges the finding of a violation for Order No. 9106664 on grounds that the work undertaken by the drill team was not prohibited under the terms of the standard.  Respondents also challenge the unwarrantability determinations for both orders and both findings of personal liability.  For the reasons below, we affirm the Judge's decision.

## I.

## Factual and Procedural Background

### A.  Factual Background

In July 2018, Peabody contracted with REI Drilling to perform horizontal longhole drilling in the return "0" entry for Unit 3, in order to identify old works, or previously mined areas, that might be intersected when the continuous mining machine advanced.  Jt. Stip. 19. This was the fourth time such drilling had been conducted at Francisco mine, with no old works previously encountered.  Jt. Stip. 21-22.  During the relevant quarter, Francisco Mine liberated more than 1.7 million cubic feet of methane in a 24-hour period and was on a 5-day ventilation spot inspection.[4]  Jt. Stip. 31-32.

REI driller Robert Ferrin and Peabody hourly employee John Stevens arrived at the drill site at approximately 9:00 p.m. on July 22.  Jt. Stip. 25.  About five hours later, at 1:49 a.m. on July 23, the drill hit a void and air began to exit the bore hole at significant pressure.  Jt. Stip. 26. Stevens testified that his personal multi-gas detector ("spotter") showed elevated methane levels

---

[2]  The S&S and unwarrantable failure terminology is taken from section 104(d)(1) of the Act, which distinguishes as more serious any violation that "could significantly and substantially contribute to the cause and effect of a . . . mine safety or health hazard" and establishes more severe sanctions for any violation caused by "an unwarrantable failure of [an] operator to comply with . . . mandatory health or safety standards."  30 U.S.C. § 814(d)(1).

[3]  If a corporate operator has violated a mandatory standard, section 110(c) of the Act provides for the imposition of penalties for "any director, officer, or agent of such corporation who knowingly authorized, ordered or carried out such violation."  30 U.S.C. § 820(c).

[4]  Pursuant to section 103(i) of the Act, if the Secretary finds that a mine liberates more than one million cubic feet of methane in a 24-hour period, an authorized representative of the Secretary "shall provide a minimum of one spot inspection . . . of all or part of such mine during every five working days at irregular intervals."  30 U.S.C. § 813(i).

moments after the drill hit the void.[5]  Tr. 253-55.  Stevens immediately phoned the tracker and asked him to contact mine manager Michael Butler, who was on Unit 3.  Jt. Stip. 27; Tr. 252-54.

After Stevens returned from the phone, Ferrin directed Stevens to engage a blowout preventer ("BOP") to seal the hole.  However, the pressure buildup was so great that methane began seeping out of the rib.  Ferrin was concerned that closing the BOP would blow out the drill casing and they would lose control over the escaping gas, so he directed Stevens to open the BOP back up.  Ferrin decided that they would instead attempt to seal the borehole by pulling out the drill rods and installing a plug ("packer") into the hole.  Tr. 60-63, 252-54.  Unlike the BOP, this process required the drill to be energized.  Tr. 51.

The tracker contacted Butler at approximately 1:50 a.m. and stated that he was needed at the drill site.  Tr. 376-7.  Butler and maintenance foreman Bradley Cary arrived at approximately 1:53 a.m., at which point Ferrin and Stevens had already started pulling drill rods.  Tr. 99, 335, 339, 377.  Stevens met Butler by the tender[6] and informed him that they had hit old works.  Tr. 336.  As Butler approached the drill to speak with Ferrin, Butler's spotter went over range ("OR") indicating the presence of at least 5% methane.  Tr. 256, 337-38.  Butler asked Ferrin about the normal procedure after breaching old works, as Butler did not have relevant experience with this type of drilling operation.  Ferrin stated that the normal response was to pull the drill rods and seal the hole.  Butler agreed to the plan, let them continue, and went to call the tracker.  Tr. 38-39, 51-52, 56-57, 336, 339-40.

Butler then directed Cary to return to Unit 3 to kill power to the equipment and prepare to evacuate, with specific instructions not to kill power to the drill.  Tr. 278, 290-92, 340, 375.  Cary returned to Unit 3 and enlisted the aid of production supervisor James Ford in shutting down the equipment and preparing for evacuation.  Tr. 278, 317.  Evacuation of Unit 3 began at approximately 1:57 a.m.  Tr. 377.  While Cary remained at Unit 3, Ford then headed to the drill site, where Butler instructed him to find some curtains and improve ventilation over the drill.  Tr. 317-18, 344.  At approximately 2:22 a.m., Ford went back to the unit to get curtains.  Tr. 322.  He then placed a curtain by the man door at crosscut 66 to push air into the 0 entry and a curtain at crosscut 67 to put intake air across the drill.  Tr. 318-21.

While Cary and Ford were traveling back and forth from Unit 3, Stevens and Ferrin continued pulling drill rods.  The drill had a methane detector which would shut down power to the drill ("kick") if methane levels reached 2%.  The drill kicked and then restarted two to three

_____

[5]  All individuals present during this event were wearing personal detectors ("spotters") set to indicate "over range" ("OR") at 5.1% methane.  Tr. 86, 183.  Once the spotter had an OR reading, it would have to be cleared (turned off) before it could get an accurate reading again.  Tr. 254-55, 261-62, 390.

[6]  The tender is a hydraulic pump with an electric motor that runs the drill.  Tr. 445-46.  The tender is located approximately 10 feet from the drill.  Tr. 360-61.  Butler and Stevens testified that OR readings only happened next to or downwind from the drill, as opposed to the area near the tender.  Tr. 256, 341, 351.

3

times over the relevant period, indicating that methane levels were fluctuating above and below 2%. Tr. 43-44, 70, 101, 119-20, 182, 260-64, 378-79. The record also establishes that Butler, Stevens and Ferrin's personal spotters each went over range at least twice during the relevant period, though the exact timing is unclear. *See* Tr. 118-19, 253-55, 371-72; Gov. Exs. 9(b), 9(c) (readouts of methane levels).

Meanwhile, general manager Brad Rigsby had been contacted by the tracking office and informed of the breach and the methane. Tr. 399-401. He instructed the tracker to have Unit 3 cease operations and pull the miners out. Rigsby then made a call to the District Manager for the Department of Labor's Mine Safety and Health Administration ("MSHA"), who told him that he needed to evacuate. Rigsby first interpreted this as an instruction to evacuate Unit 3 but later clarified that the District Manager had meant evacuation of the entire mine. Tr. 401-02. Rigsby headed to the mine, where he spoke to Butler (by phone) and learned that the drill team had been pulling rods and was about to insert the packer plug. Rigsby ordered Butler to stop, shut everything down, "let it bleed," i.e., let the methane dissipate, and bring everyone out of the unit. Tr. 404-05, 415.

Butler informed Ferrin and Stevens that they were to stop their work and prepare to evacuate. Tr. 258, 282-83, 350-53. At this point, Ferrin and Stevens had finished pulling the drill rods and were about to start pushing the packer into the casing. Tr. 73-74, 257, 350, 381. It appears that approximately half an hour passed between Butler's arrival at the drill site and Rigsby's evacuation order, and Ferrin and Stevens were pulling drill rods for a significant portion of this time. *See* Tr. 102, 216, 377-78.

Butler directed Cary to go shut down power to the drill, which he did with the assistance of mechanic Jesse Mitchell.[7] Tr. 280-83, 350-53. Butler, Stevens, Ferrin, Cary, Mitchell and Ford (who had just finished placing curtains) then left together at approximately 3:11 a.m. Tr. 105-06, 293; Gov. Ex. 8, at 2. Cary put a lock on the substation once he reached the surface. The borehole was eventually sealed on July 24. Jt. Stip. 28.

MSHA Inspector Keith Duncan was assigned as the accident investigator on July 26. After conducting interviews and collecting data from the spotters, he issued the relevant orders on August 16, 2018. Gov. Ex. 2-3; Tr. 83, 87-89. MSHA Special Investigator Phillip Stanley subsequently notified Butler of section 110(c) personal assessments based on the same underlying conduct.

B. Judge's Decision

The Judge found that Peabody violated sections 75.323(c)(2)(ii) and (iii) because the drill remained energized and miners continued to pull drill rods for at least half an hour despite the presence of methane levels in excess of 1.5%. 44 FMSHRC at 383, 389-90. With regard to

---

[7] The record is inconsistent as to how many trips Cary made to the drill site in total. Butler's testimony suggests three (Tr. 347, 375-76) while Cary's testimony indicates only two (Tr. 280-84).

Order No. 9106664, he found that removing the drill rods was remedial action meant to address the methane source and was therefore prohibited "other work." *Id.* at 390.

The Judge affirmed the S&S designation for both orders, reasoning that the combination of high methane levels, an energized drill, and the presence of miners was reasonably likely to result in an explosion and serious injury. *Id.* at 384, 390-91. He also affirmed the high negligence and unwarrantable failure designations for both orders. Conceding that the drill team worked in good faith to address a dangerous condition, he nevertheless found that the violations were obvious, known and highly dangerous, and of an extent and duration sufficient to support an unwarrantability finding. *Id.* at 385-88, 391.

Finally, the Judge found Butler personally liable for the operator's violations of sections 75.323(c)(2)(ii) and (iii). He explained that Butler was aware of at least two OR readings and had authority to shut down the drill and evacuate miners, but instead oversaw the continued operation of the energized drill for at least half an hour. Accordingly, he found that Butler was an agent of the operator who knew of the violative conditions and was in a position to remedy the situation but failed to act. *Id.* at 392.

Balancing findings of high gravity and negligence against Peabody and Butler's efforts to swiftly abate the methane hazard, the Judge assessed $38,000 per order to Peabody, and $3,000 per assessment to Butler. *Id.* at 396.

C. Arguments on Appeal

Peabody concedes that it failed to de-energize in violation of section 75.323(c)(2)(ii) (Order No. 9106663) but challenges the Judge's finding that the miners were engaged in work that was prohibited under section 75.323(c)(2)(iii) (Order No. 9106664). Peabody claims the Judge's interpretation of "other work" was overly restrictive, and section 75.323(c)(2) should be read to allow ventilation control and other work intended to manage methane. As Ferrin and Stevens were working to prevent methane from escaping, Peabody states there was no violation. P. Br. at 12-18. The Secretary counters that the standard prohibits anything other than work necessary to deenergize equipment or withdraw miners, and explicitly prohibits work with energized equipment. S. Br. at 18-20.

Peabody also challenges the Judge's findings of unwarrantable failure for both orders. Peabody takes issue with the Judge's findings on the extent, duration, and degree of danger associated with the violations. P. Br. at 20-29. Peabody also contends more generally that the Judge failed to give sufficient weight to Butler's good faith belief that he was acting appropriately and in the interests of safety. *Id.* at 20-21. The Secretary counters that any good faith belief was unreasonable in this instance. S. Br. at 27.

Finally, Respondents claim that Butler's conduct did not meet the level of culpability required for personal liability because Butler reasonably believed the cited conduct was safe. P. Br. at 29-33. Alternatively, Peabody claims Butler was trying to address the methane hazard and therefore did not fail to act to correct the condition. *Id.* at 31. The Secretary reiterates that any good faith belief in the safety of such conduct was not reasonable. S. Br. at 31-32.

## II.

## Disposition

As discussed below, we affirm the finding of a violation for Order No. 9106664 on narrow grounds, concluding that the specific energized work undertaken by the miners was plainly prohibited by the cited standard.  We also find the Judge's unwarrantable failure and personal liability determinations are supported by substantial evidence.[8]  Finally, we reject Respondents' argument that culpability should not attach due to Butler's reasonable and good faith belief that the cited conduct was in the interests of miner safety, because we find the belief was not reasonable in this instance.

### A.  The Finding of a Violation for Order No. 9106664 is Affirmed

Order No. 9106664 alleges a violation of section 75.323(c)(2)(iii), which prohibits "other work" when methane levels exceed 1.5%.  Section 75.323(c)(2) provides that, when 1.5% or more methane is present in a return air split:

> (i)     Everyone except those persons referred to in § 104(c) of the Act shall be withdrawn from the affected area;
>
> (ii)    Other than intrinsically safe AMS, equipment in the affected area shall be deenergized, electric power shall be disconnected at the power source, and other mechanized equipment shall be shut off; *and*
>
> (iii)   No other work shall be permitted in the affected area until the methane concentration in the return air is less than 1.0 percent.

30 C.F.R. § 75.323(c)(2) (emphasis added).

The basic facts relevant to this determination are straightforward and effectively undisputed: In an area where methane levels were fluctuating above 1.5%, miners were engaged in efforts to reduce methane levels by pulling drill rods with an energized drill.[9]  *See, e.g.*, Tr. 42-44, 51, 70, 74, 101-02, 182, 253-55, 260-64, 338-39, 371-72.  Work occurred where more than

---

[8]  When reviewing a judge's factual determinations, the Commission is bound by the terms of the Mine Act to apply the substantial evidence test.  30 U.S.C. § 823(d)(2)(A)(ii)(I).  "Substantial evidence" means "'such relevant evidence as a reasonable mind might accept as adequate to support [the judge's] conclusion.'"  *Rochester & Pittsburgh Coal Co.*, 11 FMSHRC 2159, 2163 (Nov. 1989) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[9]  Peabody has not contested the violation for Order No. 9106663, i.e., that the drill was energized when more than 1.5% methane was present.  Peabody does not claim that no work was occurring in the presence of elevated methane, only that it was not prohibited "other work."  *See* P. Br. at 3-5, 14-18.

1.5% methane was present. Accordingly, this matter turns on the legal question of whether the work was prohibited by the standard. The definition of "other work" for purposes of section 75.323(c)(2)(iii) is a matter of first impression. For the reasons below, we find this work—using an energized drill to remove drill rods—was prohibited.

The "language of a regulation . . . is the starting point for its interpretation." *Dyer v. United States*, 832 F.2d 1062, 1066 (9th Cir. 1987). Where the language of a regulatory provision is clear, the terms of that provision must be enforced as they are written unless the regulator clearly intended the words to have a different meaning or unless such a meaning would lead to absurd results. *See id.*; *Dynamic Energy Inc.*, 32 FMSHRC 1168, 1171 (Sept. 2010).

We find the plain language of the safety standard unambiguously prohibits the specific conduct at issue. Section 75.323(c)(2) has three requirements: operators must (i) withdraw miners from the affected area, (ii) deenergize equipment and disconnect power sources, and (iii) permit no other work until methane levels drop. Critically, the "and" clarifies that operators must comply with all three paragraphs. The plain language of the standard prohibits energized work, and the miners were using an energized drill. Therefore, Ferrin and Stevens' efforts with the drill constituted "other work" prohibited by the standard.

While the language of the standard speaks for itself, we note that the preamble to the final rule for section 75.323 also supports reading the three paragraphs in concert. The preamble states that "other work" in paragraph (b)(1)(i) should be "considered in context of the preceding requirement in paragraph (ii)." 61 Fed. Reg. 9764, 9778 (March 11, 1996). In other words, "other work" should be interpreted within the context of the other paragraphs within the subsection. "Other work" in paragraph (c)(2)(iii) should be interpreted consistent with the requirement in paragraph (c)(2)(ii) that equipment be deenergized.

Interpreting section 75.323(c)(2) to prohibit energized work is consistent with the intent of the standard as well as the plain language. The preamble clearly articulates and emphasizes the ignition hazard posed by allowing energized equipment in a high-methane environment. In discussing subsection (b)(2), the preamble explains that requiring power to be disconnected at the power source "prevents accidental energization of equipment and removes power from cables and circuits which may also be ignition sources." *Id.* Similarly, the preamble rejected a suggestion that certain equipment be permitted to run on battery power, stating that any benefits "would not outweigh the potential ignition hazard" and such a course "would be a departure from accepted, effective, and long-standing safety practice." *Id.* The standard does envision *some* work, as it "permit[s] appropriate actions to be taken . . . *in order to prevent an explosion*." *Id.* at 9777 (emphasis added). However, actions which *increase* the likelihood of an explosion by introducing a possible ignition source clearly would not be "appropriate" under this framework. The standard is not intended to permit energized work.

The Judge and the parties reach differing conclusions as to the full scope of "work" permitted by section 75.323(c)(2). The Secretary takes the narrowest approach, arguing that the standard only permits those tasks explicitly listed in the surrounding subsections, i.e., work related to evacuation or de-energizing. The Judge defines permissible work more broadly, looking to the preamble to conclude that ventilation work is permitted but remedial work to

correct the underlying methane hazard is not.  44 FMSHRC at 390.  Peabody's definition is broader still, arguing that the standard implicitly allows for both ventilation work and other forms of methane control.[10]

For purposes of this decision, it is unnecessary to fully define the categories of work permitted by the standard or address the reasonableness of the parties' definitions.[11]  Irrespective of whether the standard permits ventilation work or other forms of methane control, the work *cannot* conflict with the plainly stated requirement in subsection (c)(2)(ii) that all equipment be de-energized.  Because Ferrin and Stevens were engaged in work with an energized drill, that work was not permissible.  We affirm Judge's finding of a violation on different grounds.

As a final matter, Peabody suggests there should be no violation where compliance is less safe than non-compliance, and that allowing the drill team to continue attempting to plug the methane leak was safer than de-energizing and stopping work.  P. Br. at 17 n.4, 18.  The Commission has long held that diminution of safety may not be raised as a defense in an enforcement proceeding unless the operator has first petitioned for modification of the relevant safety standard.[12]  *Clinchfield Coal Co.*, 11 FMSHRC 2120, 2130 (Nov. 1989).  No such petition has been filed here.  Insofar as Peabody is raising a "diminution of safety" defense, it is rejected.

B.  The Unwarrantable Failure Determinations for Both Orders are Affirmed

The Commission has determined that unwarrantable failure means aggravated conduct constituting more than ordinary negligence.  *Emery Mining Corp.*, 9 FMSHRC 1997, 2001 (Dec. 1987).  Whether conduct is "aggravated" in the context of unwarrantable failure is determined by looking at the facts and circumstances of each case to see if any aggravating factors exist, such as the operator's knowledge of the existence of the violation, whether the violation was obvious, whether the violation posed a high degree of danger, the extent of the violative condition, the length of time that the violative condition has existed, the operator's efforts in abating the violative condition, and whether the operator has been placed on notice that greater efforts are

---

[10]  Section 75.323(c)(2)(i) references section 104(c) of the Mine Act, which exempts from evacuation requirements "any person whose presence in such area is necessary . . . to eliminate the condition described in the order."  30 U.S.C. § 814(c).

[11]  We note, however, that Inspector Duncan's understanding of permissible work differs from the Secretary's litigation position.  He testified that ventilation control is permitted so long as it does not involve the use of powered equipment.  Tr. 127, 148-49.

[12]  Section 101(c) of the Act states that, upon petition by an operator, the Secretary may modify a mandatory safety standard if "application of such standard to such mine will result in a diminution of safety to the miners."  30 U.S.C. § 811(c).  An operator may raise this affirmative defense without a modification petition *if* it can show that a modification proceeding would have been inappropriate.  *Westmoreland Coal Co.*, 7 FMSHRC 1338, 1341 (Sept. 1985).  Here, Peabody's statement that the modification process is lengthy and "has no application here" (P. Reply Br. at 13) is insufficient to establish the impropriety of the more traditional route.

necessary for compliance.  *See Manalapan Mining Co.*, 35 FMSHRC 289, 293 (Feb. 2013); *IO Coal Co.*, 31 FMSHRC 1346, 1350-57 (Dec. 2009).

The Judge affirmed the unwarrantable failure designations for both orders.[13]  He acknowledged Peabody's good faith efforts to address the underlying methane hazard but found that the violative conditions were known, obvious, extensive, extremely dangerous, and of sufficient duration to support a finding of aggravated conduct.  44 FMSHRC at 385-88, 391.  As discussed below, the Judge's findings are sufficiently supported by substantial evidence to affirm the unwarrantable failure determinations.

The record establishes that the violations were known and obvious.  Butler arrived at the drill site within minutes of the initial methane event, was informed of the plan to use the drill, approved of the plan, and remained nearby until the final order for evacuation.  Tr. 338-40, 345, 376-79.  During this time, the drill kicked at least twice indicating the presence of 2% methane, and his own spotter gave an "over range" reading at least twice indicating the presence of 5% methane.  Tr. 182-83, 338, 370-71, 378.  It was obvious and known to an agent of the operator that equipment was energized and in use with methane fluctuating above 1.5%.[14]

With respect to extensiveness, the Judge found that "no less than six miners were allowed to remain" in an area with high methane levels and an energized drill.[15]  44 FMSHRC at 386.  The record clearly shows that six miners remained in the general area, with at least two directly by the drill; Ferrin and Stevens worked the drill, Butler oversaw their work, and Cary, Ford and Mitchell traveled between the drill site and nearby areas to assist in evacuation and ventilation control.  *See* Tr. 277-78, 280-81, 293, 344, 377-78.  Extensiveness is not simply a matter of affected area, but "the material increase in the degree of risk to miners posed by the violation."  *Eastern Associated Coal Corp.*, 32 FMSHRC 1189, 1196 (Oct 2010).  In some situations, extensiveness may turn on the number of persons affected by a violation.  *Dawes Rigging & Crane Rental*, 36 FMSHRC 3075, 3079-80 (Dec. 2014) (finding a violation non-extensive where

---

[13]   The two orders at issue in this proceeding describe two aspects of related conduct (having and using energized equipment) arising from the same event and occurring under the same conditions.  The Judge reasonably incorporated the bulk of his unwarrantable failure analysis of Order No. 9106663 into his analysis of Order No. 9106664 by reference.  44 FMSHRC at 391 n.3.  We also jointly address the unwarrantability of both issuances.

[14]   At the time of these events, Butler was a mine manager and shift supervisor with authority to direct work.  Jt. Stip. 7, 30; Tr. 364-65.  Accordingly, his conduct may be imputed to Peabody for unwarrantable failure purposes.  *E.g.*, *Newtown Energy Inc.*, 38 FMSHRC 2033, 2046 (Aug. 2016).

[15]   The Judge noted that 60 miners would initially have been at risk in the event of an explosion, but he conceded that the evacuation of Unit 3 significantly lowered the number of affected miners and acknowledged that the affected area was limited to the drill site.  44 FMSHRC at 385-86.  Peabody's claim that the Judge failed to consider the limited physical area or the effect of the evacuation (P. Br. at 21-22) mischaracterizes the Judge's determination.

the conduct only endangered one individual). The Judge's extensiveness determination is consistent with Commission precedent and substantially supported by the record.

The Judge "unequivocally" found a high degree of danger sufficient for aggravated conduct, based on a central finding that the drill "remained energized even while methane levels nearby exceeded five percent, creating the conditions that could have led to combustion and a major accident." 44 FMSHRC at 387. The record supports the Judge's factual finding that equipment was energized while methane reached combustible levels. Butler, Stevens and Ferrin's spotters each gave "over range" readings at least twice during the half hour that Stevens and Ferrin were engaged in pulling drill rods. Tr. 118-19, 183, 253-55, 371-72, 377-78; Gov. Ex. 9(b), 9(c). The danger inherent in combining elevated methane levels with a possible ignition source (energized equipment) is well recognized.[16] *See* 61 Fed. Reg. at 9777-78; Tr. 219. We accept the Judge's determination that working with an energized drill while methane reached combustible levels posed a high degree of danger. *See, e.g.*, *Warren Steen Constr., Inc.*, 14 FMSHRC 1125, 1129 (July 1992) (finding aggravated conduct based on "common knowledge that power lines are hazardous").

Ferrin and Butler suggest there was no risk of ignition because methane is combustible at 5% but the drill would shut off when methane levels reached 2%. Tr. 77, 349. Significantly, however, section 75.323(c)(2)(ii) requires equipment to be deenergized *and* power to be shut off at the power source whenever methane reaches 1.5%. The standard envisions possible ignition where methane levels are below 2%, and where equipment is "off" but there is still some power in the system. *See* 61 Fed. Reg. at 9778 (disconnecting power at the source "prevents accidental energization . . . and removes power from cables and circuits which may also be ignition sources"). Moreover, moments when the drill had kicked (and was therefore "off" but not fully de-powered) would naturally be the moments with higher methane levels. The fact that the drill was not in active operation when methane went above 2% does not eliminate the risk of ignition.[17]

Peabody also claims the Judge failed to consider that the work Ferrin and Stevens were engaged in would have eliminated the danger posed by the methane. P. Br. at 28. However, the question is not whether the conduct would have eventually eliminated an underlying hazard, but whether the violation itself posed a high degree of danger. *E.g., IO Coal*, 31 FMSHRC at 1355. The violative conduct here may have eventually reduced methane levels, but it also introduced an ignition source *before* methane levels had been reduced. Peabody's efforts to mitigate one hazard introduced another, more immediate hazard. Thus, the Judge reasonably found that

---

[16] We note that Peabody has not contested the Judge's S&S finding that the presence of an ignition source such as an energized drill in conditions of 5% methane is reasonably likely to cause an explosion. 44 FMSHRC at 384.

[17] This analysis holds for Order No. 9106664 as well as Order No. 9106663. Although miners were not actively engaged in pulling drill rods during moments when the drill kicked power, they remained engaged in ongoing work that kept them by the drill. And as discussed above, the drill posed a potential ignition hazard even when not in operation. The fact that the miners were engaged in the work of pulling drill rods resulted in exposure to a dangerous hazard.

introducing a potential source of ignition into an environment with periodically combustible levels of methane posed a high degree of danger.

With respect to duration, the Judge considered testimony that the drill was energized for half an hour and testimony that the six miners exited an hour after the inundation and concluded that "the drill remained energized for 30-60 minutes." 44 FMSHRC at 386. Peabody suggests that the Judge overestimated the length of exposure by focusing on the evacuation time rather than the period that the drill was energized. P. Br. at 22-23. We agree. The violative condition was the presence and use of energized equipment, and substantial evidence only supports a finding that energized work was ongoing for approximately half an hour.[18] However, we note that the Judge provided a range, and substantial evidence supports the lower end of that range.

Peabody also claims the Judge's duration analysis failed to account for the intermittent nature of the elevated methane. The Judge conceded that methane levels dipped below 1.5% but emphasized that the methane also reached combustible levels multiple times. 44 FMSHRC at 386-87. As the Judge reasoned, the Commission has held that brief duration does not militate against a finding of unwarrantable failure where the condition is distinguishable by its high degree of danger and obvious nature, as is the case here. *Id.* at 386 (citing *Knight Hawk Coal LLC*, 38 FMSHRC 2361, 2371 (Sept 2016)); *Midwest Material Co.*, 19 FMSHRC 30, 36 (Jan. 1997). Given the weight of other factors indicating aggravated conduct, in particular the high degree of danger, the evidence that duration was intermittent and on the lower range of the Judge's estimation is not fatal to a determination of unwarrantable failure.

The Judge found five aggravating factors—obviousness, knowledge, extent, degree of danger and duration—with particular emphasis on degree of danger.[19] *See San Juan Coal Co.*, 29 FMSHRC 125, 129-30 (Mar. 2007) (finding that judges have discretion to reasonably give all relevant factors more or less weight). The Judge's factual findings are supported by substantial evidence, and his overall weighing of factors is reasonable. Respondent's actions in allowing the presence and use of energized equipment with methane levels fluctuating above 2% and 5% constitutes aggravated conduct.

As a final matter, Peabody claims there was no aggravated conduct because Butler (as Peabody's agent) reasonably believed the chosen course of action was proper. P. Br. at 20-21.

---

[18] Energized work began shortly before Butler's 1:53 a.m. arrival and ended shortly before Rigsby's 2:25 a.m. evacuation order. *See* Tr. 185, 237, 339, 350, 377, 381.

[19] In addition to the five factors discussed above, the Judge found that the operator's efforts to abate the methane hazard were a mitigating factor, and there was no evidence to suggest that the operator had been given notice that greater efforts were necessary for compliance. 44 FMSHRC at 388. Regarding abatement, we generally agree that the instinct to address the underlying methane hazard was laudable. However, the question is whether the operator made efforts to abate the *violative condition*, and the violative condition here is the existence and use of energized equipment. Abatement would consist of stopping work and de-energizing. Regardless, any error in the Judge's analysis on this point is harmless, as giving less weight to a mitigating factor only strengthens the finding of unwarrantable failure.

11

The Commission has held that an operator's reasonable and good faith belief that cited conduct complied with applicable law can be a defense to an unwarrantable failure allegation. *IO Coal*, 31 FMSHRC at 1357-58; *Cypress Plateau Mining Corp.*, 16 FMSHRC 1610, 1614–16 (Aug. 1994). We concur with the Judge's finding that any such belief was unreasonable in this instance.[20]

There is evidence to suggest that Butler genuinely believed the chosen course of action was compliant with safety regulations. Ferrin told Butler that it was normal protocol to pull the drill rods in the event of a breach, and Butler chose to defer Ferrin's expertise.[21] Tr. 339-40, 345, 366. However, as discussed above, the standard plainly prohibits work with energized equipment where methane levels are above 1.5%. A supervisor familiar with the regulations would not reasonably have followed advice contrary to the plain language of the standard.[22] Notably, as soon as General Manager Rigsby learned that miners had been working with an energized drill, he immediately ordered Butler to shut everything down, stop work and evacuate. Tr. 404-05, 415, 418-19. Assuming Butler believed Ferrin's recommended course of action was compliant with the Secretary's regulations, such a belief was not reasonable. The defense fails, and the Judge's findings of unwarrantable failure stand.

C. The Personal Liability Assessments are Affirmed

Section 110(c) of the Act provides that "[w]henever a corporate operator violates a mandatory health or safety standard," any agent of the operator "who knowingly authorized, ordered or carried out such violation" shall be subject to penalties. 30 U.S.C. § 820(c). An individual acts knowingly where he is "in a position to protect employee safety and health [and] fails to act on the basis of information that gives him knowledge or reason to know of the existence of a violative condition." *LaFarge Constr. Materials*, 20 FMSHRC 1140, 1148 (Oct.

---

[20] Although the Judge did not explicitly conduct an analysis of this "reasonable and good faith belief" defense, his finding on the issue is clear. He states in his unwarrantable failure analysis that, in light of MSHA's safety standards, "no prudent operator would have believed that it was reasonable" to continue powering the drill or permit miners to continue working in a high-methane environment. 44 FMSHRC at 388, 391.

[21] Peabody argues that it was reasonable for Butler to trust Ferrin's expertise because Butler had no experience with this type of methane event. P. Br. at 21; Tr. 366. This argument appears to suggest ignorance as a defense, which the Commission has rejected in the negligence context. *Oak Grove Res LLC & Bienia*, 38 FMSHRC 1273, 1279-80 (June 2016). Regardless, the question is not whether it was reasonable for Butler rely on Ferrin, but whether the *belief* was reasonable, i.e., that a reasonable person would believe pulling drill rods using energized equipment in an environment with periodic high methane was permissible.

[22] As noted above, we do not decide here the full scope of "other work" prohibited by the standard, only that the standard clearly prohibits work with energized equipment. If different, non-energized conduct had been at issue—for example, if Peabody had been cited for pulling drill rods by hand—an argument for reasonable belief in compliance might have produced a different result.

1998); *Kenny Richardson*, 3 FMSHRC 8, 16 (Jan. 1981). Consistent with this caselaw, the Judge outlined a three-part test attaching liability where an agent (1) knew or had reason to know of, (2) was in a position remedy, and (3) failed to act to correct a violative condition. 44 FMSHRC at 391. The Judge concluded that Butler met all three requirements. Substantial evidence, including testimony from Butler himself, supports the Judge's personal liability finding.

Butler testified that he learned of Stevens' OR reading when he arrived at the drill site, and his own spotter gave an OR reading shortly thereafter. Tr. 337-39, 351. He then approved the plan to pull the drill rods and stayed at the drill site as the work continued. Tr. 339-40. While he was at the drill site, the drill kicked two or three times and Butler's spotter gave another OR reading. Tr. 370-71, 378. In other words, Butler knew that methane was fluctuating above 2% and 5%, and that energized work was occurring. Butler had knowledge that work on energized equipment was occurring where more than 1.5% methane was present.[23]

Butler was also in a position to remedy the violative conduct. He testified that he was the "number one man" on site and had the authority to direct work. Tr. 364-65. Ferrin and Stephens agreed that they would follow Butler's instructions. Tr. 48-49, 258-59, 268. Remedying the violative conduct would have involved shutting down equipment and stopping work, and Butler had the authority to do so. Instead, Butler allowed the drill team to continue.[24] Tr. 292, 339-40, 345-46. Butler knew of work with energized equipment in a high-methane environment, had the power to stop it, and did not do so. The requirements for personal liability are met.

Respondents contend that Butler's actions do not meet the level of culpability required for personal liability because he believed his chosen course of action best served miner safety. P. Br. at 29-34. As with unwarrantable failure, the Commission has held that personal liability is predicated on aggravated conduct constituting more than ordinary negligence. *BethEnergy Mines, Inc.*, 14 FMSHRC 1232, 1245 (Aug. 1992); *Austin Powder Company and Eaton*, 21 FMSHRC 18, 26-27 (Jan. 1999). Accordingly, a reasonable and good faith belief in the safety of the cited conduct may provide a defense against personal liability.[25] *Lafarge*, 20 FMSHRC at

_____

[23] The record need not establish that Butler knew the conduct violated the standard, only that he knew of the conduct. *See Kenny Richardson*, 3 FMSHRC at 16; *Freeman United Coal Mining Co. v. FMSHRC*, 108 F.3d 358, 363 (D.C. Cir. 1997). Peabody's argument that there was no knowing violation because Butler trusted Ferrin's advice (P. Br. at 32) fails.

[24] Peabody claims Butler *was* acting to correct the violative condition, by having Ferrin and Stevens plug the borehole to reduce methane levels. P. Br. at 31. As noted, *see* n.19 *supra*, the violative conditions requiring correction were the presence and use of energized equipment in a high-methane environment, not the presence of high methane itself.

[25] In the unwarrantable failure context, the focus of this defense is belief in compliance with the cited standard. *See, e.g.*, *Oak Grove*, 38 FMSHRC at 1279-80 (finding it unreasonable to believe a method of moving supply cars was compliant). This is consistent with the unwarrantable failure analysis' interest in whether an operator knew of the *violation*. Personal liability, however, turns on knowledge of the *condition*. *See* n. 23 *supra*. Accordingly, weight may be given to a belief in safety. *See Lafarge*, 20 FMSHRC at 1150 ("An unreasonable belief that a practice is safe . . . is not a defense to liability. . . ."); *see Wyoming Fuel Co.*, 16 FMSHRC

1150; *cf. Cyprus Plateau,* 16 FMSHRC at 1615-16 (addressing unwarrantable failure). Here, we find that any belief that the cited conduct was safe was unreasonable.[26]

As a preliminary matter, we echo the Judge's sentiment that Butler's good faith efforts to address the source of the methane hazard would be "laudable" in different circumstances. 44 FMSHRC at 389. Testimony from Butler and others indicate Butler genuinely believed allowing Ferrin and Stevens to pull drill rods and plug the borehole was the best way to reduce the risk of a methane explosion. Tr. 311-12, 345-46, 384, 386. Substantial evidence indicates that Butler had a good faith belief that he was acting in the interest of miner safety.

However, we are unconvinced that the cited conduct could *reasonably* be considered safe. By permitting miners to work with energized equipment, Butler risked incurring the very hazard section 75.323(c)(2) is intended to address, i.e., potential ignition in a high-methane environment. Peabody argues that ignition was unlikely because methane was below 2% whenever the drill was operating. P. Br. at 33; Tr. 77, 349. However, as discussed above, the standard envisions a risk of ignition below 2% and where equipment is "off" but there is still power in the system.

Respondents also point out that there had been no ignition up to the point at which Rigsby ordered evacuation, and the methane hazard could have been resolved with just a few more minutes of energized work. P. Br. at 33; Tr. 345, 386. However, safety requires more than luck and optimism. Just as the occurrence of an ignition is not necessary to prove an ignition hazard existed, the absence of an ignition does not prove that an ignition hazard did not exist. *Cf. Arch of Kentucky*, 20 FMSHRC 1321, 1330 (Dec. 1998) (the Secretary need not show that a violation caused an accident to prove that the violation was S&S). The energized drill introduced a potential ignition source, which fortunately did not result in an ignition in this instance. Further extending the period to allow Ferrin and Stevens to finish their work was a risk. Incurring a risk of ignition is not a reasonably safe method of addressing an ignition hazard.

Nor could the cited conduct reasonably be considered the safest option of addressing the more general hazard of a methane explosion. Combustion requires both elevated methane levels and an ignition source. The compliant method of addressing the combustion hazard would have been to stop work, de-energize equipment, let the methane bleed out and evacuate. Butler was aware of this option, and this was the course of action ultimately taken by the mine manager. Tr. 345-46, 393, 404-05, 415. Under this approach, methane levels would have taken some time

---

1618, 1629-30 (Aug. 1994) (where a manager reasonably believed his actions would correct methane problems and comply with the Secretary's regulations, the manager was not subject to personal liability and the violation was not unwarrantable).

[26] The Judge did not directly address this defense in his personal liability analysis. However, he found in his unwarrantable failure analysis that allowing miners to work with energized equipment in a high-methane environment was unreasonable given the significant risk it posed to miner safety. 44 FMSHRC at 388, 391. In other words, it was not reasonable to believe the cited conduct was safe. The failure to explicitly reiterate this finding is at most harmless error.

to abate, but risk of ignition would have been significantly reduced and miners would have been removed from danger.

Instead, Butler approved energized work to plug the borehole. Essentially, Butler determined that the benefit of rapidly reducing methane levels outweighed the risk of incurring ignition. Butler's approach may have been more efficient with respect to reducing methane levels, but in the short term it increased the chances of combustion. Reducing excessive methane is a worthwhile goal, but not if the mine explodes first.[27] Butler's course of action was not the reasonable choice for miner safety. The defense is rejected, and the personal liability assessments stand.

## IV.

### Conclusion

For the reasons above, the Judge's decision is affirmed.

_____

Arthur R. Traynor, III, Chair

_____

William I. Althen, Commissioner

_____

Marco M. Rajkovich, Jr., Commissioner

---

[27] Cary testified that working to quickly resolve the methane leak was safer than allowing methane to build up during the 45 minutes it would take to evacuate. Tr. 311-12. However, assuming *arguendo* that circumstances exist where it would be appropriate to incur a risk of ignition, Cary's math does not add up. Ferrin stated that he and Stevens could have plugged the methane leak with another 15-20 minutes of work. Tr. 71. However, they had already been working for approximately half an hour when they were ordered to stop and evacuate. In other words, miners could spend 45 minutes evacuating with elevated methane levels but no potential ignition sources, or 45 minutes working with elevated methane levels *and* potential ignition sources (followed by 45 evacuating in high methane if the attempt to plug the leak failed). Cary's testimony fails to convince that the chosen course of action was safer than simply getting out of the mine.

Distribution:

R. Henry Moore
Fisher & Phillips LLP
6PPG Place, Suite 830
Pittsburgh, PA 15222
hmoore@fisherphillips.com

Susannah M. Maltz
Office of the Solicitor, U.S. Department of Labor
Division of Mine Safety and Health
201 12th Street South, Suite 401, Arlington, VA 22202
Maltz.Susannah.M@dol.gov

Emily Toler Scott, Esq.
Counsel for Appellate Litigation
Office of the Solicitor, U.S. Department of Labor
Division of Mine Safety and Health
201 12th Street South, Suite 401
Arlington, VA 22202
Scott.Emily.T@dol.gov

April Nelson, Esq.
Associate Solicitor
Office of the Solicitor, U.S. Department of Labor
Division of Mine Safety and Health
201 12th Street South, Suite 401
Arlington, VA 22202
Nelson.April@dol.gov

Melanie Garris
Civil Penalty Compliance Division Chief
U.S. Department of Labor, Office of Assessments
Mine Safety and Health Administration
201 12th Street South, Suite 401
Arlington, VA 22202
Garris.Melanie@dol.gov

Chief Administrative Law Judge Glynn F. Voisin
Federal Mine Safety & Health Review Commission
1331 Pennsylvania Avenue, NW, Suite 520N
Washington, DC 20004-1710
GVoisin@fmshrc.gov

Administrative Law Judge David Simonton
Federal Mine Safety & Health Review Commission
721 19th Street, Suite 443
Denver, CO 80202-2500
DSimonton@fmshrc.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the Certificate as to Parties, Rulings, Related Cases and Underlying Decision from Which Review Arises was served upon the following parties on the 6th day of October, 2022 via electronic filing:

> Sarah Stewart
> Deputy General Counsel
> Federal Mine Safety and Health Review Commission
> 1331 Pennsylvania Ave., NW, Suite 520N
> Washington, DC 20004-1710
> sstewart@fmshrc.gov
>
> Emily Toler Scott, Esq.
> Office of the Solicitor
> Division of Mine Safety & Health
> 201 12th Street South, Suite 401
> Arlington, VA 22202
> *scott.emily.t@dol.gov*
>
> Susannah Maltz
> Attorney
> Office of the Solicitor
> Division of Mine Safety and Health
> U.S. Department of Labor
> 201 12th Street South – Suite 401
> Arlington, VA  22202-5450
> *Maltz.susannah.m@dol.gov*

*s/ R. Henry Moore, II*